**E-FILED**
Wednesday, 26 August, 2009  10:20:14 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| LORI HAFLEY, | ) | |
| *as Special Administrator of the* | ) | |
| *Estate of Robert McFadin*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 06-cv-1254 |
| v. | ) | |
| | ) | |
| CITY OF SPRING VALLEY; | ) | |
| OFFICER THOMAS QUARTUCCI, | ) | |
| Individually; and POLICE CHIEF | ) | |
| DOUG BERNABEI, Individually, | ) | |
| | ) | |
| Defendants. | ) | |

## O P I N I O N  &  O R D E R

Before the Court is an Amended Motion for Summary Judgment as to Plaintiff's Federal Claims, filed by Defendants City of Spring Valley and Thomas Quartucci on February 27, 2009 (Doc. 21).  Plaintiff Lori Hafley responded in opposition to the motion on March 23, 2009, and Defendants replied on April 2, 2009.  For the reasons stated below, Defendants' amended summary judgment motion is GRANTED.

## BACKGROUND

This federal civil rights action stems from the suicide of Robert McFadin. McFadin used a police officer's handgun to take his own life while detained at a police station in Spring Valley, Illinois on April 23, 2005.  Lori Hafley, the plaintiff, is McFadin's mother and is suing in her capacity as Special Administrator of his

estate.  Hafley has brought suit, pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution, against the City of Spring Valley and individual law enforcement officials to recover civil damages for McFadin's death.  Hafley's § 1983 claims are grounded in the Fourteenth Amendment's protection against the "deliberate indifference" of law enforcement officials to the substantial risk of serious harm to a pretrial detainee.  In addition to her § 1983 claims, Hafley has brought supplemental state-law claims pursuant to the Illinois Wrongful Death Act, 740 Ill. Comp. Stat. 180/1 et seq., and the Illinois Survival Act, 755 Ill. Comp. Stat. 5/27-6.

### Factual Background[1]

On the morning of April 23, 2005, Officer Thomas Quartucci (a police officer employed by the City of Spring Valley Police Department since 1985) telephoned Robert McFadin and asked him to come to the Spring Valley police station to be interviewed in connection with a complaint that McFadin had violated an order of protection which his estranged wife held against him.  (Defs.' UMF ¶¶ A1, A10-12). McFadin voluntarily arrived at the police station that morning to be interviewed. (Defs.' UMF ¶ A13).  Upon his arrival, McFadin accompanied Officer Quartucci to

---

[1] In responding to Defendants' list of material facts, Hafley (who is represented by counsel) has completely failed to comply with Local Rule 7.1(D)(2).  As a result, it is difficult for the Court to discern which, if any, of Defendants' stated facts Hafley is disputing.  In her response brief, Hafley provides facts which she says are meant to "supplement the statement of facts provided by Defendants."  (Pl.'s Resp. at p. 1). The Court will take Hafley at her word and will construe her stated facts as merely supplementary (as opposed to contrary) to the facts as stated by Defendants. Accordingly, the Court deems Defendants' statement of material facts to be undisputed.  Defendants have provided a Local Rule 7.1(D)(3)-compliant reply which precisely identifies which of Hafley's supplementary facts are disputed.

the police station's intake room.  (Defs.' UMF ¶ A14).  Officer Quartucci proceeded

to interview McFadin without placing him under arrest.  (Defs.' UMF ¶ A15).

During the interview, McFadin appeared calm and collected; he exhibited no

obvious signs of agitation.  (Defs.' UMF ¶¶ A16-17).  After speaking with McFadin

about the disturbance that necessitated the interview -- which apparently involved

a dispute between McFadin and his wife over an automobile -- Officer Quartucci

was unsure whether McFadin's conduct during the incident constituted a violation

of the protection order.  (Defs.' UMF ¶ A19).  To get clarification, Quartucci phoned

Assistant State's Attorney Tony Sciuto.  McFadin was present for the phone call.

(Defs.' UMF ¶ A21).  During the conversation, Sciuto advised Quartucci to arrest

McFadin on charges of violating the protection order.  (Defs.' UMF ¶ A20).  When

McFadin learned that he would be arrested, he told Officer Quartucci that he did

not believe he had violated the order; but McFadin did not become angry or raise his

voice.  (Defs.' UMF ¶ A22).  Officer Quartucci asked McFadin if he was going to be

uncooperative, and McFadin answered that he would not cause a problem --

although he expressed to Quartucci that he did not understand why he was being

arrested.  (Defs.' UMF ¶ A26).  At some point around the time this dialogue took

place, Quartucci placed McFadin under arrest.[2]  McFadin remained docile and gave

no indication that he would become violent.  (Defs.' UMF ¶ A27).

---

[2] Quartucci did not put McFadin through the normal booking process because
McFadin was already inside the police station when the decision to arrest him was
made and because McFadin had already been booked during the early morning
hours of April 23, 2005 on other charges of driving under the influence of alcohol
and leaving the scene of an accident.  (Defs.' UMF ¶¶ A8, A24-25).  In not

At about noon, Officer Quartucci secured McFadin in a holding cell at the police station and began to arrange for McFadin's transport to the county jail. (Defs.' UMF ¶ A29). While McFadin was housed in the holding cell, Quartucci checked on him every fifteen minutes (at 12:15 p.m. and 12:30 p.m.) and recorded the check-ups in a jail cell log. (Defs.' UMF ¶¶ A30-31). At approximately 12:35 p.m., while Officer Quartucci was in the station's radio room along with dispatcher Patricia Sment, Quartucci heard a knocking on the door of McFadin's holding cell. (Defs.' UMF ¶ A32). At this time Quartucci and Sment were the only two police personnel in the station, and the door separating the radio room from the cell hallway was open. (Defs.' UMF ¶ A33; Defs.' Reply ¶ A11). In response to the noise, Quartucci walked up to the door of McFadin's cell. When Quartucci looked through the window in the cell door, he saw McFadin holding his hands out. He saw that McFadin's left wrist was bleeding. (Defs.' UMF ¶ A35). Quartucci asked McFadin how his wrist became injured, and McFadin told Quartucci that he was scratching his wrists to make them bleed. (Defs.' UMF ¶ A36). It is unclear and disputed whether McFadin told Quartucci that he was trying to commit suicide. (Defs.' Reply ¶¶ A12, E37). In any event, Quartucci obviously understood that McFadin was trying to injure himself. (Defs.' UMF ¶ A37).

Officer Quartucci decided to take immediate action by entering the cell in order to handcuff McFadin and thereby prevent him from injuring himself any further. (Defs.' UMF ¶¶ A39-40). Accordingly, Quartucci entered the cell and

reprocessing McFadin, Quartucci followed the instruction of Assistant Police Chief Kevin Sangston. (Defs.' UMF ¶ A25).

ordered McFadin to stand up.  (Defs.' UMF ¶ A41).  Suddenly, the heavy cell door

hit against its frame behind Quartucci.  The noise startled Quartucci, causing him

to turn and look back at the door for a moment.  (Defs.' UMF ¶ A43).  Immediately,

McFadin landed a forceful punch to Quartucci's right temple.  (Defs.' UMF ¶ A44).

Phased by the punch, Quartucci put his hands up in defense.  He yelled to McFadin,

"[N]o, don't do this, you don't want to do this."  (Defs.' UMF ¶ A45).  McFadin

ignored Quartucci's statement and continued to punch him, striking him in the

right eye and knocking him out of the cell and into the hallway.  (Defs.' UMF ¶

A46).  Quartucci hit against the hallway wall and was knocked to his knees.

McFadin then positioned himself on top of Quartucci and continued to punch him in

the face.  (Defs.' UMF ¶¶ A47-48, B13).  Quartucci yelled to dispatcher Patricia

Sment for help.  Sment ran from the radio room into the hallway and attempted to

pry McFadin off Quartucci.  (Defs.' UMF ¶¶ B14-15).  As she tried to pull McFadin

away, Sment saw McFadin's hand go up Officer Quartucci's side toward his

handgun.  (Defs.' UMF ¶ B16).  Believing that McFadin would gain control of the

gun, Sment ran back into the radio room to call for help.  (Defs.' UMF ¶ B17).

Covered in blood and unable to strike back at McFadin, Quartucci lost

consciousness.  (Defs.' UMF ¶¶ A48-50).

At some point, Officer Quartucci regained consciousness.  Realizing that his

jacket had been pulled over his head, Quartucci immediately felt for his handgun

and found that it was missing from its holster.  (Defs.' UMF ¶ A51).  Quartucci was

able to get to his feet and walk to the radio room, where Sment was calling for help.

(Defs.' UMF ¶ B18). As he fled toward the radio room, Quartucci was able to see McFadin facing him and backing down the cell hallway. (Defs.' UMF ¶ A55). Upon reaching the radio room, Quartucci told Sment that McFadin had possession of his gun. (Defs.' UMF ¶¶ A52, B18). With Officer Quartucci inside the radio room, Sment slammed shut the door separating the radio room from the hallway. (Defs.' UMF ¶ B19). Quartucci and Sment then both fled the police station. (Defs.' UMF ¶ B20). On the way out, Sment heard a "pop" that sounded like a gunshot. (Defs.' UMF ¶ B20). McFadin had taken his own life with Officer Quartucci's gun. Quartucci spent the next three days in a hospital intensive care unit; he ultimately recovered but did not return to work as a police officer. (Defs.' UMF ¶ A59; Ex. A to Defs.' Am. SJ Mot., Quartucci Dep., at p. 19).

Nearly a year after the events of April 23, 2005, Lori Hafley filed a civil suit in Illinois circuit court against the City of Spring Valley, Officer Quartucci, and Spring Valley Police Chief Doug Bernabei in connection with McFadin's suicide.[3] During the course of discovery in the state-court suit, Officer Quartucci gave deposition testimony. At his deposition, Quartucci admitted that he had never received any training with respect to identifying potentially suicidal detainees. He also testified that he was not aware whether the Spring Valley Police Department had a program requiring officers to undergo this type of training. (Quartucci Dep. at pp. 33-34). It was also revealed at Quartucci's deposition that a few years before the incident involving McFadin, Quartucci had been involved in a somewhat similar

---

[3] This state-court action will be discussed in greater detail below.

incident in which a suspect was able to remove Quartucci's gun from its holster and squeeze off three shots before being contained.  (Quartucci Dep. at pp. 27-32). Quartucci and his supervisors had discussed this prior incident and had determined that the suspect was able to remove the gun because Quartucci's outdated holster had no preventative snap.  Accordingly, Quartucci was issued a new weapon and an updated safety holster with a preventative snap.  In addition, he underwent additional weapons retention training classes.  (Quartucci Dep. at pp. 31-32, 86-87, 91).  During his struggle with McFadin on April 23, 2005, Officer Quartucci was wearing the updated holster.  The holster's safety mechanism required a forward push and a simultaneous upward pull to release the gun.  (Quartucci Dep. at p. 87).

During his deposition, Quartucci also gave his account of the events leading up to McFadin's suicide.  Quartucci testified that once he understood McFadin was attempting to harm himself, he decided to immediately enter the cell and handcuff McFadin before calling medical personnel.  Quartucci further testified that although he believed McFadin intended to injure himself, it never crossed his mind that McFadin was trying to kill himself.  (Quartucci Dep. at pp. 59-60).  When asked whether he remembered telling an investigator that McFadin was attempting suicide by scratching at his wrists, Quartucci said that he could not.  (Quartucci Dep. at p. 59).  According to Quartucci's testimony, prior to the violent outburst inside the cell, there was no indication that McFadin would become violent toward anyone at the police station.  (Quartucci Dep. at pp. 44-46, 58-60, 89-93).  Quartucci testified that, as a simple safety precaution, he asked police dispatcher Patricia

Sment to leave the radio room while he and McFadin passed through the room on their way from the intake area to the cell hallway.  Quartucci testified that, normally, detainees at the Spring Valley Police Department are not brought through the dispatch room.  McFadin was brought through the dispatch room only because he was in the station at the time of his arrest and because Quartucci had been told by his supervisor that it was unnecessary to book or process McFadin under the circumstances.  (Quartucci Dep. at pp. 47-48).

Patricia Sment also gave deposition testimony.  She testified that on April 23, 2005, Quartucci asked her to leave the radio room so that he could transport McFadin through the room.  Sment answered in the affirmative when asked whether Quartucci's request for her to leave was a procedural safety precaution. (Ex. B to Defs.' Am. SJ Mot., Sment Dep., at pp. 7-8).  However, Sment also stated that it was not general protocol for her to leave the radio room when an officer transported an arrestee from the intake room (although, as she explained, it was not necessary to pass through the dispatch room when traveling between the intake area and the cell hallway).  (Sment Dep. at pp. 11-14).  During her deposition Sment seemed to admit that when McFadin was present in the station's cell hallway area on April 23, 2005, the door separating the radio room from the hallway was unlocked despite a departmental rule requiring the door to be locked when an arrestee is in the hallway.  (Sment Dep. at pp. 6-7, 26-27).  Sment also testified that McFadin's wife arrived at the station at some point on April 23, 2005 and was speaking to someone near the dispatch room.  (Sment Dep. at pp. 15-17).

Police Chief Doug Bernabei was also deposed in the course of Hafley's state-court action.  Bernabei testified that he did not know whether Quartucci had ever received instruction on identifying potentially suicidal arrestees.  When asked whether the Spring Valley Police Department ran programs to educate officers on identifying suicidal arrestees, Bernabei stated, "Well, there's -- there's policies regarding that, treating people with mental illness.  There's periodic training classes that might be available."  (Ex. C to Defs.' Am. SJ Mot., Bernabei Dep., at pp. 34-35).  When asked specifically whether there was "a procedure in Spring Valley where officers at least once a year receive training with regard[ ] to learning about mental health issues and inmates and more specifically identifying suicidal behavior in suspects, arrestees, or detainees," Bernabei stated that there was not.  (Bernabei Dep. at p. 35).[4]

### Procedural History

On March 31, 2006, Hafley filed a civil suit in the Circuit Court of the Thirteenth Judicial Circuit, Bureau County, Illinois, on behalf of Robert McFadin's estate in connection with McFadin's April 23, 2005 suicide.[5]  Hafley sued under the Illinois Wrongful Death Act and named as defendants the City of Spring Valley, Officer Quartucci, and Police Chief Doug Bernabei.  (Doc. 13, Defs.' 10/24/2007

---

[4] The parties have also submitted incident reports and deposition testimony by investigators from the Bureau County, Illinois Sheriff's Office.  These investigators conducted interviews related to the events preceding McFadin's suicide.  With respect to the facts material to this federal action, the investigators' testimony and reports merely restate or closely parallel the deposition testimony set out above.

[5] The suit was subsequently transferred to LaSalle County due to judicial recusal. (Doc. 14, Pl.'s 11/7/2007 Mem. re Stay at p. 1).

Mem. re Stay at p. 2).  In August 2006, Hafley amended her state-court complaint for the first time.  On October 5, 2006, Hafley filed the instant action in federal court.  In the federal suit, she raised § 1983 claims as well as state-law claims that essentially paralleled her claims in state court.  (Doc. 1, 10/5/2009 Compl.).  In February 2007, Hafley amended her state-court complaint for the second time.  In April 2007, the state court dismissed her second amended complaint with leave to refile.  (Defs.' 10/24/2007 Mem. re Stay at p. 3).  On or about May 22, 2007, Hafley filed a third amended complaint in state court -- her final version.  Her third amended complaint raised one count against each defendant (the City, Quartucci, and Bernabei) under the Illinois Wrongful Death Act and an additional count against Bernabei under the Illinois Domestic Violence Act.  (Ex. A to Defs.' 10/24/2007 Mem. re Stay, Pl.'s Third Amended Complaint in Illinois Circuit Court; Defs.' 10/24/2007 Mem. re Stay at pp. 2-3).

On July 25, 2007, the state court dismissed with prejudice all claims against Bernabei and took the remaining claims under advisement.  (Defs.' 10/24/2007 Mem. re Stay at p. 3).  On August 9, 2007, the state court followed up on its July ruling and allowed the Wrongful Death Act claims against the City and Quartucci to stand.  But the court essentially narrowed the case to one issue: whether Quartucci's act of entering McFadin's cell with a gun was a willful and wanton act under state law.  (Ex. B to Defs.' 10/24/2007 Mem. re Stay, Transcript of Proceedings in Illinois Circuit Court on 8/9/2007 at p. 4).

Meanwhile, in federal court, Defendants filed a motion to dismiss, which was granted in part (as to the § 1983 claim against Bernabei) and denied in part on September 24, 2007.  (Doc. 12, 9/24/2007 Opinion & Order re Defs.' Mot. to Dismiss). In the September 24, 2007 Order, the Court took preliminary notice of the related proceeding in Illinois circuit court and directed the parties to file briefs addressing whether there should be a stay of the federal proceedings -- under the doctrine of "wise judicial administration" announced in Colorado River Water Conservation District v. United States, 424 U.S. 800, 818-19 (1976) -- to avoid duplicative or piecemeal litigation in state and federal court.[6]  Accordingly, the parties submitted briefs addressing whether the circumstances warranted a stay.  (9/24/2007 Opinion & Order re Defs.' Mot. to Dismiss at pp. 13-15).  The parties agreed that the Colorado River standard for issuing a stay was satisfied, but they disagreed on whether the federal action should be stayed or dismissed.  On April 3, 2008, this Court decided to stay the federal action in accordance with Seventh Circuit precedent advising that a stay is preferred to a dismissal in the Colorado River context.  (Doc. 17, 4/3/2008 Order Staying Case at pp. 3-4).  The federal action was

---

[6] A two-part test is used to determine whether a stay of federal proceedings is appropriate under Colorado River.  First, the federal action must be "parallel" to an ongoing state action.  The "parallel" inquiry involves a comparison of the legal issues and parties involved in both actions.  LaDuke v. Burlington Northern R.R. Co., 879 F.2d 1556, 1559 (7th Cir. 1989).  Second, there must be "exceptional circumstances" justifying the stay of federal proceedings.  The "exceptional circumstances" inquiry incorporates various considerations such as the desirability of avoiding piecemeal litigation, the inconvenience of the federal forum, the order in which jurisdiction was obtained by the concurrent forums, etc.  Id.

ordered stayed pending the outcome of the parallel proceeding in Illinois circuit court.

On December 9, 2008, the state court granted Defendants' motion for summary judgment in its entirety, holding that no reasonable jury could find that Officer Quartucci's act of entering McFadin's cell while armed amounted to willful and wanton conduct under the circumstances. (Ex. I to Defs.' 2/27/2009 Am. SJ Mot., Transcript of Proceedings in Illinois Circuit Court dated 12/9/2008). Hafley subsequently filed a notice of appeal to the Illinois Appellate Court, Third District. (Doc. 19, Defs.' 2/9/2009 Mot. to Lift Stay ¶ 4). Her appeal is pending.

In February 2009, Defendants moved to lift the stay of federal proceedings. (Doc. 19). At the same time, Defendants moved for summary judgment in federal court based on the res judicata effect of the state court's judgment against Hafley. Alternatively, Defendants requested summary judgment on the merits of Hafley's claims. (Doc. 18). On February 25, 2009, this Court held a hearing on Defendants' motion to lift the stay. The Court decided to lift the stay as to Hafley's federal claims only, and the Court asked Defendants to file an amended summary judgment motion addressing only the federal claims.[7] (Minute Entry for Proceedings on 2/25/2009 re Lifting of the Stay). Accordingly, on February 27, 2009, Defendants City of Spring Valley and Thomas Quartucci filed an Amended Motion for Summary

---

[7] There was some confusion at the hearing as to whether Hafley's § 1983 claims had been subject to the stay in the first place (or whether the action was stayed only as to her state claims). The issue is addressed in a later footnote.

Judgment addressing Hafley's § 1983 claims. (Doc. 21). Defendants' amended summary judgment motion is now fully briefed and ripe for disposition.

## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the court must view the evidence on record in the light most favorable to the non-moving party. SMS Demag Aktiengesellschaft v. Material Sciences Corp., 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant; however, the court is not required to draw every conceivable inference from the record. Smith v. Hope School, 560 F.3d 694, 699 (7th Cir. 2009). The court draws only reasonable inferences. Id. If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796 (7th Cir. 1997).

## ANALYSIS

Defendants' lead argument on summary judgment is based on the doctrine of res judicata. Defendants assert that the judgment against Hafley in the parallel state-court action precludes her § 1983 claims in this federal action. In the alternative, Defendants argue that (i) qualified immunity shields Quartucci from § 1983 liability in connection with McFadin's suicide and (ii) there is an insufficient

evidentiary basis from which to impose § 1983 liability on the City of Spring Valley for McFadin's death.

I.     <u>Res Judicata</u>

Under federal law, state judicial proceedings "shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken." 28 U.S.C. § 1738.  In applying § 1738, a federal court must adhere to the preclusion law of the state in which the judgment was rendered.  <u>Migra v. Warren City School Dist. Bd. of Educ.</u>, 465 U.S. 75, 81 (1984).  The judgment at issue in the present action was issued by an Illinois circuit court, so Illinois law of preclusion applies.  Under Illinois law of preclusion as stated by the state's highest court,

> [A] final judgment on the merits rendered by a court of competent jurisdiction acts as a bar to a subsequent suit between the parties involving the same cause of action.  The bar extends to what was actually decided in the first action, as well as those matters that could have been decided in that suit. For the doctrine of res judicata to apply, the following three requirements must be satisfied: (1) there was a final judgment on the merits rendered by a court of competent jurisdiction, (2) there is an identity of cause of action, and (3) there is an identity of parties or their privies.

<u>River Park, Inc. v. City of Highland Park</u>, 703 N.E.2d 883, 889 (Ill. 1998) (internal citations omitted).  For purposes of the identity-of-cause-of-action requirement, "[T]he assertion of different kinds or theories of relief still constitutes a single cause of action if a single group of operative facts give rise to the assertion of relief."  <u>Id.</u> at 891 (internal quotations omitted).  In other words, a "cause of action" is a set of facts under which a plaintiff may file suit for relief.

The elements of res judicata under Illinois law are satisfied in the present action.  It is beyond dispute that the same set of facts gave rise to both the state-court action and this parallel federal proceeding: the events of April 23, 2005 culminating in Robert McFadin's suicide.  On December 9, 2008, the Illinois circuit court granted summary judgment to Thomas Quartucci and the City of Spring Valley on Hafley's claims under the Illinois Wrongful Death Act, terminating the state proceeding at the trial court level.  It is undisputed and clear from the transcript of proceedings in state court on December 9, 2008 (and from the corresponding written order) that the court's summary judgment ruling was a final adjudication on the merits of Hafley's claims.[8]  Hafley does not dispute the state court's exercise of jurisdiction, nor does she dispute the court's subject-matter jurisdiction to adjudicate claims under § 1983.  Lastly, it is uncontroverted that the present federal action involves the exact same parties involved in the state-court action.

Because res judicata applies, the state court's adjudication acts as a bar to any further litigation between Hafley and Defendants regarding McFadin's April 23, 2005 suicide and the core events leading up to it.  The bar extends to what was actually decided in the state-court suit, as well as those matters that <u>could have</u> been decided in that suit.  The state court had subject-matter jurisdiction to

_____

[8] The presiding state circuit judge expressly stated in his December 9, 2008 summary judgment ruling, "Obviously, this is a final and appealable order." (Transcript of Proceedings in Illinois Circuit Court dated 12/9/2008 at p. 19). Earlier, on July 25, 2007, the state court had dismissed with prejudice all claims against Doug Bernabei.

adjudicate Hafley's § 1983 claims, but Hafley chose not to bring those claims in the state proceeding.  Blount v. Stroud, 904 N.E.2d 1, 17 (Ill. 2009) (confirming that Illinois circuit courts are courts of general jurisdiction and are presumptively competent to adjudicate federal claims); see, e.g., Nelson v. Crystal Lake Park Dist., 796 N.E.2d 646, 650-53 (Ill. App. Ct. 2003) (considering and remanding to Illinois circuit court a Fourteenth Amendment claim brought pursuant to § 1983).  There is no reason to believe that the state court would not have fairly and adequately adjudicated Hafley's § 1983 claims had she raised them in that forum.  Accordingly, the § 1983 claims against the City of Spring Valley and Thomas Quartucci are barred because Hafley could have raised them (but did not) in the parallel state-court action.  The ultimate outcome of Hafley's state-court appeal makes no difference as to her § 1983 claims because Hafley did not raise those claims at the circuit court level and has, therefore, waived them on appeal.  See Hatch v. Szymanski, 759 N.E.2d 585, 589-90 (Ill. App. Ct. 2001); see also Maher & Assocs., Inc. v. Quality Cabinets, 640 N.E.2d 1000, 1009 (Ill. App. Ct. 1994) (applying the waiver rule to appeal of summary judgment order).

Hafley has no good argument against the application of res judicata to bar her federal claims.  She seems to confuse res judicata with collateral estoppel when she argues that the state court's rulings on issues of state law do not affect the viability of her federal claims.[9]  (Pl.'s Resp. at pp. 6-7)  Hafley may be accurate in

---

[9] Collateral estoppel, or issue preclusion, applies to bar re-litigation of issues that were actually decided by a prior adjudication.  Res judicata, or claim preclusion, applies to bar litigation of issues or claims that could have been raised in a prior

arguing that her state-law and § 1983 claims are based on separate standards -- each standard looking to a separate and distinct body of judicial precedent.  But that is not the point.  The point is that she could have raised her § 1983 claims in the state-court action but chose not to.[10]

In staying federal proceedings pursuant to <u>Colorado River</u> on April 3, 2008, this Court yielded adjudication of the instant cause of action to the state court.  A stay of a federal action in deference to a state-court action, under <u>Colorado River</u>, usually ends (in substance) the litigation in the federal forum because collateral estoppel and res judicata attach to the state court's judgment.  <u>Evans Transp. Co. v. Scullin Steel Co.</u>, 693 F.2d 715, 718 (7th Cir. 1982).  The general "out-of-federal-court" consequence of a <u>Colorado River</u> stay is no different in a federal suit involving § 1983 claims.  <u>See</u> <u>Migra</u>, 465 U.S. at 83-85 (holding that the preclusive effect of a state-court judgment, under 28 U.S.C. § 1738, is not dampened in a federal suit under § 1983).  More specifically, "Section 1983 . . . does not override state preclusion law and guarantee [a plaintiff the] right to proceed to judgment in state court on her state claims and then turn to federal court for adjudication of her

---

suit arising from a single group of operative facts.  <u>See</u> <u>Charles Koen & Assocs. v. City of Cairo</u>, 909 F.2d 992, 997 (7th Cir. 1990) (drawing the distinction).

[10] Hafley cites <u>Payne v. Churchich</u>, 161 F.3d 1030, 1038 (7th Cir. 1999) in arguing that res judicata does not apply under the present circumstances.  In <u>Payne</u>, the Court of Appeals disagreed with the district court's application of res judicata to bar claims related to an issue decided in state court prior to removal of the case to federal court.  <u>Id.</u>  The present case involves a completely different postural setting than <u>Payne</u>.  Here, two separate lawsuits are involved: one in state court and one in federal court.  Hafley's parallel state-court action was never removed to federal court.

federal claims." Id. at 85.  If Hafley wanted to have her § 1983 claims decided in

this Court, she should have objected to a Colorado River stay.  Instead, she

expressly consented to the stay.  (Pl.'s 11/7/2007 Mem. re Stay at pp. 3-5).[11]  Now, by

operation of the doctrine of res judicata, Hafley is precluded from further litigating

her § 1983 claims regarding McFadin's suicide.

> II.    The Merits of Hafley's § 1983 Claims

Hafley would not prevail on her § 1983 claims against Quartucci and the City

even if those claims were not barred by res judicata.  The facts, viewed in the light

most favorable to Hafley, do not establish that a Fourteenth Amendment violation

occurred.

> A. Quartucci

Defendant Quartucci argues that the doctrine of qualified immunity shields

him from § 1983 liability in connection with McFadin's suicide.  Qualified immunity

protects government officials from liability for civil damages to the extent their

conduct does not violate "clearly established statutory or constitutional rights of

---

[11] Although neither party mentions the issue, the Court may have caused some confusion at the February 25, 2009 hearing by suggesting in error that Hafley's federal claims were not the subject of the stay.  The written Stay Order of April 3, 2008 was clear on its face that the federal action was being stayed in its entirety pending the outcome of the parallel state proceeding.  At any rate, it is difficult to see how any confusion about the scope of the stay prejudiced Hafley.  She took no action to move her federal claims forward after the stay was put in place.  It would have been wise for Hafley to have raised her § 1983 claims in state court even if a federal stay had never been issued at all.  Even in the absence of a stay, if the state court had come to a final judgment on the merits prior to a judgment by this Court, res judicata would still have applied.  See U.S.O. Corp. v. Mizuho Holding Co., 547 F.3d 749, 750 (7th Cir. 2008) (noting the "race-to-judgment" concern created by res judicata in the context of ongoing parallel proceedings); see also In re City of Mobile, 75 F.3d 605, 612 (11th Cir. 1996) (same).

which a reasonable person would have known." Pearson v. Callahan, 129 S.Ct. 808, 815 (2009). To determine the applicability of qualified immunity on summary judgment, a court must engage in a two-part analysis to determine: (1) whether the facts, viewed in the light most favorable to the plaintiff (non-movant), establish the violation of a constitutional right and (2) whether the constitutional right at issue was "clearly established" at the time of the official's purportedly illegitimate conduct. Id. at 815-16; see also Cavalieri v. Shepard, 321 F.3d 616, 620 (7th Cir. 2003). As the United States Supreme Court recently announced in Pearson, a district court has the discretion to consider which part of the test to address first. 129 S.Ct. at 818 (receding from Saucier v. Katz, 533 U.S. 194 (2001)).

   In the present case, it is most efficient to resolve the qualified immunity issue by considering whether a reasonable jury could find that a constitutional violation occurred. The Fourteenth Amendment is violated where a law enforcement official exhibits "deliberate indifference" to a risk of serious injury to a pretrial detainee. The "deliberate indifference" inquiry, on summary judgment, requires a court to decide whether the facts could reasonably establish that (i) the harm to the injured party was objectively serious and (ii) the government official was deliberately indifferent to the injured party's health or safety. Cavalieri, 321 F.3d at 620. Prong (i) is established in this case because "[i]t goes without saying that suicide is a serious harm." Sanville v. McCaughtry, 266 F.3d 724, 733 (7th Cir. 2001) (internal quotations omitted). So the analysis turns to Prong (ii), which requires a showing that Quartucci knew McFadin was at a substantial risk of committing suicide and

that Quartucci intentionally disregarded that risk.  Matos v. O'Sullivan, 335 F.3d

553, 557 (7th Cir. 2003).  Deliberate indifference is "more than mere or gross

negligence, but less than purposeful infliction of harm."  Id.

There is evidence sufficient to support a jury's conclusion that Quartucci

knew McFadin was at a substantial risk of suicide: Quartucci observed McFadin

trying to make his own wrists bleed by scratching at them.

There is insufficient evidence, however, to support a jury's conclusion that

Quartucci intentionally disregarded the risk of McFadin's suicide when he entered

McFadin's cell while armed with a handgun.  Quartucci did not hand McFadin his

gun or willingly make it available to him.  Rather, McFadin attacked Quartucci and

stripped the gun from him, somehow outmaneuvering the safety mechanism built

into Quartucci's holster.  The present case is distinguishable from cases like

Cavalieri v. Shepard, where a suicidal detainee hanged himself with the metal cord

of a telephone located inside the holding cell to which he was assigned.  321 F.3d at

620.  Here, the instrument that McFadin used to commit suicide was not made

readily available to him.  Moreover, the evidence does not support a finding that

Quartucci subjectively appreciated the real possibility that McFadin would assault

him and attempt to take his weapon.  The uncontroverted evidence shows that prior

to his brutal attack on Quartucci at approximately 12:35 p.m. on April 23, 2005,

McFadin exhibited no "red flag" behavioral signs or warnings that he would assault

an officer while detained at the police station.

All parties would probably agree that it was not a good idea for Quartucci to enter the cell as he did, but deliberate indifference is a more demanding standard than negligence.  Quartucci's actions on April 23, 2005 did not amount to deliberate indifference to McFadin's risk of suicide.  Because there was no underlying constitutional violation, it is not necessary to proceed with the remainder of the qualified immunity analysis.

### B.  City of Spring Valley

Hafley maintains that the City was deliberately indifferent, under the Fourteenth Amendment, to the risk that McFadin would commit suicide.  A municipality can be found liable under § 1983 only if a municipal policy or custom causes the alleged constitutional deprivation.  Canton v. Harris, 489 U.S. 378, 385 (1989).  Hafley's only coherent argument as to municipal liability focuses on the City's alleged custom of failing to train its police officers to identify or properly handle suicidal arrestees.  A municipal policy or custom that condones inadequate police training is actionable under § 1983 "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  Id. at 388.  In Canton, the Supreme Court noted,

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees.  But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

Id. at 390.

Hafley relies primarily on <u>Woodward v. Correctional Medical Services of Illinois, Inc.</u>, 368 F.3d 917 (7th Cir. 2004) in making her failure-to-train argument. <u>Woodward</u> involved a pretrial detainee who hanged himself with a bed sheet while detained at a county jail.  The administrator of the detainee's estate filed suit under § 1983 against a corporation hired by the county to provide medical and mental health services at the jail.  A jury returned a verdict in the administrator's favor, finding that the corporation had acted with deliberate indifference to the detainee's health and safety.  Treating the medical services corporation the same as a municipality for § 1983 purposes (because it was performing a public function under color of state law), the Court of Appeals upheld the jury's verdict.  The Court of Appeals found the evidence sufficient to establish that the corporation permitted a custom to prevail whereby its staff exhibited disregard for training and standards related to the identification and handling of suicidal detainees.  368 F.3d at 927-28. Specifically, the Court of Appeals pointed to evidence implicating several employees and managers in connection with the corporation's culture of indifference to detainees who were at risk of suicide.

Woodward is distinguishable from the case at bar, the key difference being sufficiency of the evidence.  Here, the evidence is insufficient to support a jury's finding that the Spring Valley Police Department condoned a policy or custom of indifference to the identification or handling of potentially suicidal arrestees.  While it may be true that Quartucci never received training regarding suicidal arrestees in his approximately twenty years as an officer with the Department, Hafley has

22

failed to produce evidence sufficient to show that Quartucci's lack of training is something other than an isolated occurrence.  See Canton, 489 U.S. at 390-91.  Besides Quartucci's testimony, the only other probative material evidence supporting Hafley's failure-to-train argument is Police Chief Bernabei's testimony that the Department did not train its officers at least once annually on how to identify potentially suicidal inmates.  But Hafley never explains why this type of training program is necessary on an annual basis.  Bernabei testified that the Department had policies in place and periodic training classes on the handling of mentally ill detainees.  (Bernabei Dep. at pp. 34-35).  There is no adequate basis for the City's § 1983 liability in connection with McFadin's suicide absent a more-developed showing of a pervasive indifference among Department personnel as to the safety of potentially suicidal inmates.[12]

III.   State-Law Claims

There is currently a partial stay in place as to Hafley's supplemental state-law claims.  These claims mirror the claims that were adjudicated on the merits in Illinois circuit court, and there is no longer a substantial need for this Court to retain jurisdiction over them.  The partial stay will be lifted immediately, and the

---

[12] Hafley attempts to establish the City's liability by pointing to a "series of bad acts," see Woodward, 368 F.3d at 927, in which employees of the Spring Valley Police Department purportedly violated the Department's own internal policies or standards.  Her argument is unpersuasive -- and, frankly, confusing -- because she never cogently ties the list of purported infractions to the issue of whether the City had a custom of deliberate indifference to the risk of suicide by arrestees.  Any other argument or theory for municipal liability asserted by Hafley is underdeveloped and will not be considered.  See Kramer v. Banc of Am. Sec., LLC, 355 F.3d 961, 964 n.1 (7th Cir. 2004) (underdeveloped arguments are waived).

supplemental claims will be dismissed without prejudice because all federal claims have fallen out of the suit.  See Groce v. Eli Lilly & Co., 193 F.3d 496, 501 (7th Cir. 1999).

## CONCLUSION

Defendants' Amended Motion for Summary Judgment as to Plaintiff's Federal Claims (Doc. 21) is GRANTED.  The partial stay as to Plaintiff Hafley's supplemental state-law claims is LIFTED, and the state-law claims are hereby DISMISSED WITHOUT PREJUDICE.

CASE TERMINATED.

ENTERED this 26th day of August, 2009.

s/ Joe B. McDade
JOE BILLY McDADE
United States District Judge
